**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

|  |  |
|---|---|
| CRAIG CUNNINGHAM, <br><br>        Plaintiff, <br> v. <br><br> ZEETO GROUP, LLC, <br><br>        Defendant. | No. 4:17-cv-00882-ALM-CAN |

**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Pursuant to Fed. Rs. Civ. P. 12(b)(1) and (b)(6), and Local Rule CV-7, Defendant ZeetoGroup, LLC ("Zeeto") respectfully moves for an order dismissing Plaintiff's Second Amended Complaint ("SAC") (ECF 43).

## I.    INTRODUCTION

This is a Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, case brought by a serial litigant who has clogged the federal court dockets with nearly 120 TCPA cases since 2014. The current Federal Communications Commission ("FCC")[1] Chairman, Ajit Pai, has emphasized that "the TCPA has strayed far from its original purpose" and "become the poster child for lawsuit abuse." *In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 8073, (2015) (Pai, dissenting). This Court, too, has stated that "TCPA suits have, in many instances, been abused by serial litigants[.]" *Morris v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-00638-ALM-CAN, 2016 WL 7115973, at *6 (E.D. Tex. Nov. 9, 2016) (Nowak, J.). Plaintiff's SAC epitomizes everything that Chairman Pai and this Court have identified as wrong with the TCPA today. It should be dismissed for several independent reasons. In broad, conclusory brush strokes, Plaintiff claims that Zeeto violated the TCPA by allegedly sending him via autodialer 19 unsolicited text messages specifically addressed to a woman named "Lynda." He also asserts that Zeeto violated the TCPA by purportedly failing to adequately identify itself in the text messages it sent to Plaintiff. Finally, Plaintiff alleges that these same actions invaded his privacy under Texas common law. As detailed below, the SAC should be dismissed for a host of independent reasons.

First, Plaintiff lacks Article III standing. The SAC fails to explain how any harm Plaintiff allegedly suffered could be traced to Zeeto's alleged use of an autodialer. It is not a

---

[1]    The FCC is the federal agency charged with enforcing the TCPA.

violation of the TCPA to send a manually dialed, unsolicited text message; it is not a TCPA violation to send 100 manually dialed, unsolicited text messages seriatim. Rather, it is a TCPA violation to send an unsolicited, autodialed text message. Accordingly, a plaintiff must demonstrate that any injury he suffered was due to the defendant's use of an autodialer. Plaintiff has not met that burden. He is also without Article III standing because, as a professional plaintiff who has boasted about "baiting" companies into lawsuits and authored blogs about "TCPA enforcement for fun and profit," he falls outside the TCPA's zone of interest. Put simply, he is not the type of consumer whom the TCPA's drafters intended to protect.

Second, Plaintiff's claim that Zeeto violated the TCPA by allegedly failing to sufficiently identify itself in the text messages that he received so as to allow him to contact Zeeto cannot stand for several reasons – (1) there is no private right of action for failure to comply with the TCPA's technical and procedural standards, including its identification requirements; (2) Plaintiff's one-sentence allegation merely parrots the language of the TCPA and, as such, is wholly conclusory; (3) that Section of the TCPA applies, by its express terms, only to calls (or texts) to "residential" landline telephone numbers and Plaintiff alleges that he received the text messages on his cell phone; and (4) the texts complied with the TCPA in any event as each one contained a link to Zeeto's website, thereby allowing Plaintiff to identify that the texts were sent by Zeeto and to contact the company.

Third, Plaintiff's allegation that Zeeto violated the TCPA by using an "automatic telephone dialing system" (also referred to as an autodialer or "ATDS") to send him text messages fails because none of the support he relies upon to substantiate the claim – *e.g.*, that the texts were sent from a short code; that Plaintiff received two identical texts on a single day four hours apart; that Zeeto's website privacy policy generally notes that "***some***" of its texting

campaigns "*may* be conducted via automated telephone dialing system"; and that Zeeto's internal records utilize terms such as "campaign field" or "system field" – make it any more plausible that the texts he received were sent via ATDS than not. They simply have no bearing on the salient issue of whether an autodialer was used. Even if an ATDS was used, however, given that it is uncontested that Zeeto had obtained prior express written consent from an individual named "Lynda" to send autodialed text messages and that Lynda erroneously entered Plaintiff's cell phone number into the underlying lead form, no TCPA liability can attach unless Zeeto's reliance on that consent was unreasonable. Plaintiff has made no such claim and is prevented from doing so by the very documents he references in the SAC.[2]

Plaintiff's common law invasion of privacy claim (based upon intrusion of seclusion) fails because the mere receipt of allegedly unwanted texts is not the type of physical or wiretapping-type intrusion that supports the cause of action. Even if it was, the sending of the texts was not unreasonable under the circumstances, nor substantial enough that an ordinary person would feel severely offended, humiliated, or outraged, as required under Texas law.

For any and all of these reasons, the Court should dismiss Plaintiff's complaint.

## II.   **PLAINTIFF'S ALLEGATIONS**

In his SAC, Plaintiff alleges that, over a 41-day period between October 22 and December 1, 2017, he received 19 "promotional type" text messages from the same SMS short code without his consent. SAC ¶¶ 5–8. The text messages offered gift cards for a range of restaurants and consumer products, and each referenced the website "getitfree.us," which is owned and operated by Zeeto. *Id*. ¶ 6. Ten of the text messages were addressed specifically to an individual named "Lynda." *Id*. ¶ 7; FAC, Exh. A (ECF 13-1), at Oct. 22, 24, and Nov. 4, 7, 9,

---

[2]     The SAC references the exhibits Plaintiff attached to his First Amended Complaint ("FAC") as if they also were attached to his SAC, which they were not. Nonetheless, Zeeto treats them as if they had herein.

14, 16, 20, 24, 28, 2017 Text Messages (directing messages to "Lynda").

Plaintiff asserts that "[e]ach and every message [he received] was initiated using an [ATDS]," and that the use of an alleged autodialer to send the unsolicited text messages constitutes a violation of the TCPA. *Id.* ¶¶ 20–21. Plaintiff attempts to support his claim that an ATDS was used by asserting that:

(1) The messages were sent from a "short code," *id.* ¶¶ 10-12;[3]

(2) Zeeto's website privacy policy creates a "presumption" that it uses an autodialer because the policy includes a TCPA express consent disclosure noting that "some of [the text messages Zeeto sends] may be conducted via an automated dialing system," *id.* ¶ 13;

(3) Zeeto's "*Get It Free SMS Program Policy*," attached to FAC as Exh. G (ECF 13-7) references a welcome message that consumers who consent to receive text messages from Zeeto will receive, which is similar to the one that Plaintiff received, SAC ¶ 15;

(4) A screenshot of Zeeto's internal record of consent to send the text at issues utilizes the phrases "system fields" and "campaign fields," *id.* ¶ 17;

(5) Pre-suit correspondence from Zeeto references Plaintiff's cell phone number being in its "system," *id.* ¶ 18; and

(6) Plaintiff once received duplicative text messages from Zeeto in a single day, four hours apart. *Id.* ¶ 19; FAC, Exh. A.

Plaintiff also claims, in conclusory fashion, that Zeeto violated the TCPA by failing to properly identify itself in the texts that he received. SAC ¶ 32. Finally, he asserts that "[t]he foregoing actions" invaded his privacy. *Id.* ¶ 34.

## III.    LEGAL STANDARDS

### A.    Dismissal for Lack of Standing Under Rule 12(b)(1)

Fed. R. Civ. P. 12(b)(1) governs challenges to a court's subject matter jurisdiction over a particular case. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A federal court

---

[3]        A short code is simply a number (usually five or six digits), shorter than the traditional ten-digit numbers associated with telephone numbers, which can send and/or receive text messages.

does not have the power to hear cases where Article III standing is not satisfied.  *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018).  To establish Article III standing, a plaintiff must satisfy three elements: (1) "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) traceability/causation – "there must be a causal connection between the injury and the conduct complained of"; and (3) redressability – "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).  The "injury must affect the plaintiff in a personal and individual way."  *Id.* at 560 n.1.

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.  Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist" for each particular claim he asserts.  *Ramming*, 281 F.3d at 161 (internal citation omitted).  When ruling on a Rule 12(b)(1) motion, a court may consider extrinsic evidence and documents beyond the complaint, *id.*, and the allegations of the complaint will not be cloaked with a presumption of truth, as they are on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009).

**B.     Dismissal For Failure to State a Claim Under Rule 12(b)(6)**

The purpose of a motion to dismiss made under Rule 12(b)(6) is to test the legal sufficiency of a complaint.  *Mackin v. Carpenter*, 988 F.2d 1212 (5th Cir. 1993); *Quadri v. McHugh*, No. 5:14CV35, 2015 WL 124550, at *4 (E.D. Tex. Jan. 7, 2015).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The *Iqbal* Court emphasized the

distinction between factual contentions and legal conclusions, and cautioned against accepting as sufficient "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." 556 U.S. at 678; *Whitlock v. Lazer Spot, Inc*., 657 Fed. App'x 284, 286 (5th Cir. 2016). At the pleading stage, only well-pled factual allegations are entitled to a presumption of truth. *XP Innovations Inc. v. Black Rapid, Inc*., No. H-13-1856, 2013 WL 6230368, at *2 (S.D. Tex. Dec. 2, 2013). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Hale v. King*, 642 F.3d 492, 503 n.35 (5th Cir. 2011) (internal citations omitted). After *Twombly* and *Iqbal*, "'complaints in civil actions [must] be alleged with greater specificity than previously was required.'" *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

## IV.    ARGUMENT

### A.    Plaintiff Lacks Article III Standing for his TCPA Claims

Plaintiff does not have Article III standing that allows him to proceed in federal court on either of his TCPA claims for two reasons. First, Plaintiff has not pled how any harm he suffered is traceable to Zeeto's alleged use of an ATDS. A plaintiff asserting a TCPA claim must demonstrate that the injury complained of is connected to the specific TCPA violation, here, the alleged use of an autodialer and the failure to maintain or train on the use of an internal do not call list. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In *Ewing v. SQM U.S., Inc*., for example, the plaintiff alleged that "he actually incurred a specific charge for Defendants' call to his cellular telephone." 211 F. Supp. 3d 1289, 1293 (S.D. Cal. 2016). Upon the defendants' standing challenge, the court held that the second element of Article III standing (traceability/causation) was not met because, even assuming that the plaintiff was charged for the

call, the plaintiff:

> [C]annot connect this claimed charge with the alleged TCPA violation – Defendants' use of an ATDS to dial his cellular telephone number. Put differently, plaintiff does not, and cannot, allege that Defendants' use of an ATDS to dial his number caused him to incur a charge that he would not have incurred had Defendants manually dialed his number, which would not have violated the TCPA.

*Id.*

*Ewing* is not alone. Last year, this same principle was embraced in a case alleging TCPA "junk fax" violations. *See ARcare v. Qiagen N. Am. Holdings, Inc.*, No. CV 16-7638, 2017 WL 449173, at *1 (C.D. Cal. Jan. 19, 2017). In *ARcare,* the plaintiff alleged that, as a result of the faxes it received, which did not include the opt-out notices required by the TCPA, it "lost paper, toner, ink, and time that could have otherwise been spent on business activities." *Id.* In granting the defendant's motion to dismiss, the court explained:

> The TCPA does not prohibit the sending of any fax; it applies only to unsolicited advertisements which do not include an appropriate opt-out notice. Plaintiff does not attempt to show how it was injured by the receipt of faxes with opt-out notices which failed to fully comply with the TCPA, instead alleging harm which would result from the receipt of any fax.

*Id.* at *4. "[H]ad the faxes 'fully complied with the TCPA, Plaintiff would have lost the same amount of ink, toner, paper and time. In such situations, a plaintiff lacks standing.'" *Id*. at *3 (citation omitted).[4] The court further noted that its conclusion that the plaintiff lacked standing was "particularly appropriate" where the defendant's faxes included a simple opt-out mechanism through which the plaintiff could avoid receiving future faxes, "and the Complaint is devoid of any allegations that Plaintiff attempted to avail itself of that mechanism . . ." *Id*., at *3 n.1.

Here, Plaintiff claims to have received 19 autodialed text messages for which he had not

---

[4]     Relying on the Supreme Court's decision in *Lujan*, the court rejected as "misstat[ing] the applicable standard" the plaintiff's argument that, in order to show traceability for Article III standing purposes, it need only plausibly allege that the defendant's conduct was the source of its harm. *Id*. at *4 (citing *Lujan*, 504 U.S. at 560)).

provided prior express consent.  SAC ¶ 8.  He claims that, as a result of the receipt of those messages, he was injured in the form of (1) reduced "[d]evice [s]torage space," "data plan usage," "battery usage," and "enjoyment and usage of [his] cell phone" (due to needing to charge the phone more frequently), (2) lost time from reviewing the text messages, and (3) invasion of privacy, annoyance, frustration, and "[a]nger."  *Id*. ¶ 30.  Plaintiff, however, has not – and cannot – allege that an autodialed text would constitute any harm different than if the text were manually dialed, which would not be a TCPA violation as manually dialed text messages do not require any consent from the recipient.  In other words, Plaintiff would have suffered the exact same alleged injuries if the texts were sent to him manually.  His "harms" are not traceable to the alleged TCPA violation – the use of an autodialer.[5]  Thus, Plaintiff has failed to satisfy the traceability/causation element necessary to satisfy standing.

Dismissal on such grounds is, as the *ARcare* court explained, "particularly appropriate" given that the first text Plaintiff received contained the familiar advisement that he need only respond "STOP to opt out" of receiving future messages.  FAC, Exh. A (screenshot of Oct. 22, 2017 text message).  Plaintiff does not claim to have done so.[6]  *See ARcare*, 2017 WL 449173, at *3 n.1 (holding it was "particularly appropriate" to dismiss complaint on standing grounds where plaintiff failed to allege that he availed himself of simple opt-out mechanism, which would have prevented receipt of future unsolicited faxes).

Second, Plaintiff lacks standing because he is not a member of the class of persons that the TCPA was designed to protect.  The TCPA was enacted to protect consumers from

---

[5]    The same analysis applies with equal force to Plaintiff's claim that Zeeto failed to properly identify itself in the text messages that he received.

[6]    In fact, in his opposition to Zeeto's motion to dismiss the initial Complaint, Plaintiff acknowledged that he did not reply STOP.  ECF 12, ¶ 26.  (Plaintiff "is not required to register his phone number on any do-not-call list or respond 'stop' to a text message that Plaintiff didn't sign up for" even though "[he] hope[s not] to receive telemarketing calls.").

unwanted, intrusive telephone calls. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370, 372 (2012) (the purpose of the TCPA is to remedy "certain practices invasive of privacy" and "intrusive, nuisance [telemarketing] calls") (citations omitted); *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 797 (W.D. Pa. 1997) (citing *Mims*). As this Court recognized in *Morris*, "[o]ther federal courts have held that professional plaintiffs do not have standing to sue under the TCPA" because those plaintiffs do not fall within TCPA's "zone of interest." 2016 WL 7115973, at *6 (E.D. Tex. Nov. 9, 2016) (citations omitted). In *Morris*, Judge Nowak specifically noted that, although the plaintiff had filed "a significant number of TCPA cases" – at least 36 lawsuits – he did not yet rise to the level of "professional plaintiff" such that he would fall outside the zone of interest and not have standing. *Id*. The Court cautioned, however, "that TCPA suits have, in many instances, been abused by serial litigants; and ***going forward each such case merits close scrutiny on the issue of standing in light of Spokeo.***" *Id*. (emphasis added).

This is exactly the kind of TCPA suit that Judge Nowak envisioned. Plaintiff is a serial litigant who has filed almost 120 TCPA lawsuits since 2014. *See* Exh. "1" attached hereto.[7] Plaintiff makes no mystery about his choice to operate as a professional plaintiff. For example, he has authored blogs (under the screen name "codename 47") such as "TCPA enforcement for fun and for profit up to 3k per call";[8] prided himself on suing companies even where he knew

---

[7]     Exhibit 1 is a table compiling every TCPA lawsuit filed by Plaintiff of which Defendants are aware. This Court may take judicial notice of the fact that the same Plaintiff has filed a number of prior TCPA lawsuits. *Crozier v. Endel*, No. 3:09-cv-00535, 2010 WL 5141766, at *4 (D. Nev. Dec. 10, 2010). Fifteen of Plaintiff's suits were filed in this Court. *See* Exh. 1, at Rows 2, 6-8, 10-12, 16, 17, 21, 28, 38, 41, 42, and 67. The Court may take judicial notice of those dockets. *Johnson v. Dir., TDCJ-CID*, No. 6:12CV340, 2012 WL 3135647, at *1 (E.D Tex May 29, 2012).

[8]     A copy of this since-deleted blog was attached to the Retail Industry Leaders Association's ("RILA") 2017 comments in response to a pending FCC petition filed by Plaintiff requesting that the FCC require the heightened type of TCPA consent (prior express ***written*** consent) for all types of calls. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Comments of RILA, FCC Docket No. 05-338, at Exh.          E          (Mar.          10,          2017)          (*available          at*

that no TCPA violation had occurred ("I just filed before they had violated yet and dismissed it later"), Exh. 3, at 6; boasted about his TCPA settlements sharing "how much it was worth for me to go away," Exh. 3, at 7; and aspired to author a book entitled, "Tales of a Debt Collection Terrorist: How I Beat the Credit Industry At Its Own Game and Made Big Money From the Beat Down."[9]  His "motives [are] fun and profit."  *Id*.  Indeed, Plaintiff's never-published book's co-author described Plaintiff's "baiting" strategy for drumming up lawsuits.  *Id*. (quoting Plaintiff's co-author).

Plaintiff does not seek to avoid telemarketing calls but, rather hopes for them so that he can file lawsuits and/or seek to extort pre-suit nuisance settlements.  Indeed, if an experienced TCPA litigant such as Plaintiff did not want to receive such calls, it calls into question why he has not registered his telephone number on the National Do Not Call Registry or did not simply responded "STOP" to the first text message that he received from Zeeto.  Plaintiff is not the type of consumer that the TCPA is designed to protect.  He, therefore, falls outside the statute's zone of interest and lacks standing under Article III.[10]

---

https://ecfsapi.fcc.gov/file/10310251423131/Comments%20of%20the%20Retail%20Industry%20Leaders%20Assoc iation.pdf).  A copy of that blog post also is attached hereto for the Court's convenience at Exhibit "2."  The Court may take judicial notice of the blog post.  *Gusman v. Comcast Corp*., No. 13CV1049, 2014 WL 2115472, at *5 (S.D. Cal. May 21, 2014) ("The Court may take judicial notice of . . . declaratory ruling petitions filed with the FCC, and subsequent filings by the FCC and other parties on the same docket.") (internal citations omitted).  Another version of the blog post, which contains Plaintiff's subsequent dialogues with commenters, was attached as Exhibit 3 to the defendant's motion to dismiss in *Cunningham v. Local Lighthouse*, No. 3:16-cv-02284 (M.D. Tenn. Mot. filed Oct. 14, 2016), and is attached hereto as Exhibit "3" for the Court's convenience.  The Court may take judicial notice of that blog as well.  *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012), *aff'd sub nom.*, 736 F.3d 528 (D.C. Cir. 2013).

[9]    Sean Murray, *'Debt Collection Terrorist' Wants FCC to Get Rid of Implied Consent in TCPA*, DeBanked (Feb. 9, 2017) (*available at* http://debanked.com/2017/02/debt-collection-terrorist-wants-fcc-to-get-rid-of-implied-consent-in-tcpa/) (last accessed Apr. 4, 2018).

[10]    Plaintiff may argue that, because *Stoops* was decided at the summary judgment phase, the Court should not decide whether he falls within the TCPA's zone of interest at this juncture.  However, the  basis for the Western District of Pennsylvania's decision that the plaintiff did not come within the TCPA's zone of interest in *Stoops* was based on discovery revealing that she "collected a shoe box full of cell phones [more than 40] to fish for accidental wrong number calls," thereby enabling her to file TCPA lawsuits. 197 F. Supp. 3d at 796, 802.  Not only is no such discovery needed in this case, but no amount of discovery can change Plaintiff's well-documented litigation history and public comments.  Plaintiff also may try to rely upon *Cunningham v. Rapid Response Monitoring Servs.*, 251 F.

**B.    Count I Should Be Dismissed Because There Is Not Private Right of Action for Failure to Comply With the TCPA's Identification Requirements; That Section of the TCPA Applies Only to Communications to Residential Landlines; and Plaintiff's SAC Belies Such Claim In the First Instance**

In Count I of his SAC, Plaintiff claims that the text messages he received "violated the TCPA, 47 USC 227(c)(5) via 47 CFR 64.1200(d)(4) as [Zeeto] failed to include the required identification of the seller/telemarketer as the messages lacked the name of the entity on whose behalf the texts were being sent and a telephone number where that person can be contacted." SAC ¶ 32.  This claim fails for several reasons.

First, the TCPA provides no private right of action for failure to comply with the identification requirements of 47 C.F.R. § 64.1200(d)(4).  Indeed, "the regulations regarding identification and the provision of a telephone number or address found in [Section] 64.1200(d)(4) are technical and procedural in nature and were promulgated pursuant to Section 227(d) of the TCPA. . . .  [T]hat section of the TCPA does not contain a private right of action[.]"  *Burdge v. Ass'n Health Care Mgmt., Inc*., No. 1:10-CV-00100, 2011 WL 379159, at *4 (S.D. Ohio Feb. 2, 2011).  *See also Worsham v. Travel Options, Inc.*, No. 14-2749, 2016 WL 4592373, at *7 (D. Md. Sept. 2, 2016) (". . . § 64.1200(d)(4) is more appropriately viewed as setting procedural standards and, therefore, within the realm of the TCPA's subsection *d* [47 U.S.C. § 227(d)], for which no private right of action exists."); *Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835, 842 (E.D. La. 2012) (agreeing with *Burdge* and concluding that plaintiff could not "articulate a plausible . . . legal basis  to recover for violation of [47 C.F.R. § 64.1200(d)(4)]").  Because there is no private right of action to enforce alleged violations of 47

Supp. 3d 1187 (M.D. Tenn. 2017), in which the court rejected an Article III standing challenge based on Plaintiff's status as a professional plaintiff.  In that case, however, the court identified only six other TCPA cases filed by Plaintiff.  *Id*., at 1191.  Plaintiff has filed **_nearly 20 times_** that number of cases in the past four years alone (and more than three times the 36 cases filed by the plaintiff in *Morris*).  *Rapid Response* is simply no longer applicable to the standing analysis with respect to this Plaintiff.

11

C.F.R. § 64.1200(d)(4), Count I fails.

Second, even if there were a private right of action to enforce 47 C.F.R. § 64.1200(d)(4), Plaintiff's allegation of a violation of that regulation is wholly conclusory, which the Court does not accept as true for purposes of a motion to dismiss. *Jackson v. United States*, 68 F.3d 471 (5th Cir. 1995) (affirming dismissal against pro se litigants and explaining that, on a Rule 12(b)(6) motion, "[t]he plaintiff must plead specific facts, not mere conclusory allegations. This court will not accept as true conclusory allegations or unwarranted deductions of fact") (internal citation omitted). In fact, the Eastern District of Louisiana found that striking similar allegations were too conclusory to state a claim under the TCPA. *See Bailey*, 867 F. Supp. 2d at 842 (E.D. La. 2012). In *Bailey*, the plaintiff claimed that he received three texts from Domino's Pizza offering various pizza promotions; some texts referenced "Domino's Pizzas" by name, but all included a link to the Domino's website. *Bailey*, No. 2:11-cv-000004 (E.D. La.), Complaint (ECF 1) ¶¶ 23-25.[11] As a result, the plaintiff asserted that Domino's violated 47 C.F.R. § 64.1200(d)(4) by "failing to provide called parties with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a working telephone number or address at which  the person or entity may be contacted." *Id.* ¶ 44. The court held that such allegation "simply recites the requirements of 47 C.F.R. § 64.1200(d)" and, as such, did not state a claim. 867 F. Supp. 2d at 842. Like the *Bailey* plaintiff, Plaintiff merely parrots the language of 47 C.F.R. § 64.1200(d)(4) and fails to plead any facts supporting his assertion that Zeeto failed to identify itself in the texts he received. Such failure alone justifies dismissal.

Third, Plaintiff's Section 227(c)(5) claim fails as a matter of law. That provision of the

---

[11]     The texts that the plaintiff received read: (1) "Get 3 or more Medium 1 topping Domino's Pizzas for $5.55 each. Use promo code M5555online. http://m.dominos.com?pc=M555&un=ravensrants" (twice); and (2) "3+ Med 1-top pizzas or Sandwiches for $5 each. Use promo code MBTB online. http://m.dominos.com?pc=MBTB&un=ravensrants" (once). *Id.*

TCPA, by its express terms, provides for a private right of action only for violations of the FCC's regulations promulgated to "to protect *residential* telephone subscribers' privacy rights to avoid receiving telephone solicitations *to which they object*."  47 U.S.C. § 227(c) (emphasis added).  To ensure that consumers do not receive telemarketing calls "to which they object," the FCC adopted the National Do Not Call Registry on which consumers could place their residential telephone numbers.  *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 Fed. Reg. 44144-01, at ¶ 3 (July 25, 2003).  Pursuant to the FCC's regulations, which are embodied in 47 C.F.R. § 64.1200(d), "[n]o person or entity shall initiate any call for telemarketing purposes to a *residential* telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."  (emphasis added). Identifying the seller or telemarketer responsible for making the call or sending the text message is one component of such procedures.  *Id*. § 64.1200(d)(4).

At least five times over the past two years, Section 227(c)(5) claims asserted via 47 C.F.R. § 64.1200(d), including subsection (d)(4), brought by Plaintiff against other defendants were dismissed on grounds that those provisions apply only to calls to residential telephone numbers.  *See Cunningham v. Rapid Cap. Funding, LLC/RCF*, No. 3:16-cv-02629, 2017 WL 3574451, at *2-3 (M.D. Tenn. July 27, 2017); *Cunningham v. Spectrum Tax Relief, LLC*, No. 3:16-2283, 2017 WL 3222559, at *3 (M.D. Tenn. July 7, 2017); *Cunningham v. Enagic USA, Inc*., No. 3:15-cv-0847, 2017 WL 2719992, at *5-6 (M.D. Tenn. June 23, 2017), *report and recommendation adopted*, 2017 WL 2935784 (M.D. Tenn. July 10, 2017); *Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d  1187, 1200-01 (M.D. Tenn. 2017); *see also Cunningham v. Trilegiant Corp*., No. 3:15-cv-989 (M.D. Tenn.), Report and Recommendation

entered Aug. 26, 2016 (ECF 82) (denying Plaintiff's motion to amend his complaint, which included a Section 227(c)(5) claim, based upon alleged violations of 47 C.F.R. § 64.1200(d), on futility grounds and dismissing operative complaint).

Dismissing Plaintiff's claims, those courts held that "the language of the TCPA specifically provides that the regulations implemented pursuant to Subsection 227(c) concern only 'the need to protect residential telephone subscribers' privacy rights.'" *Spectrum Tax Relief*, 2017 WL 3222559, at *3 ("The private right of action created by 47 U.S.C. § 227(c)(5) is accordingly limited to redress for violations of the regulations that concern residential telephone subscribers."); *Rapid Cap. Funding*, 2017 WL 3574451, at *3; *Enagic USA*, 2017 WL 2719992, at *5–6 ("the language of the TCPA specifically provides that the regulations implemented pursuant to Subsection 227(c) concern only 'the need to protect residential telephone subscribers' privacy rights.' . . . Plaintiff alleges only calls to his cellular phone. Accordingly, he fails to state a claim for relief under 47 U.S.C. § 227(c)(5), and Count II should be dismissed."); *Rapid Response*, 251 F. Supp. 3d at 1200-01 ("The R & R, however, identifies another fault in Count II: Cunningham alleges only calls to his cellular phone. The TCPA generally distinguishes between "residential" lines and other protected lines . . . By Cunningham's own account, his allegations involve a cellular phone number. . . . Count II, then, will be dismissed.") Because Plaintiff alleged only calls to his cellular phone in the aforementioned cases, the courts held that he failed to state a claim for relief under 47 U.S.C. § 227(c)(5).

Plaintiff pleads in his SAC that the texts at issue were sent to his cell phone, not a residential landline. SAC ¶ 8. Thus by his own admission, Section 227(c)(5) is inapplicable. Even if that Section or the regulations were applicable to cellular telephones (and they are not), Plaintiff has not pled that his cell number either is registered on the National Do Not Call

14

Registry or set forth on Zeeto's internal do not call list (nor could he as it is not contained on either).[12]    Therefore, the underlying purpose of Section 227(c)(5) – to protect *residential* telephone subscribers from receiving telemarketing messages *to which they object* – is not implicated.

Finally, even if Plaintiff's 47 C.F.R. § 64.1200(d)(4) allegation were not conclusory (it is), a private right of action exists to enforce that regulation (there is none), and its application extended to cell phones as opposed only to residential landlines (it does not), Count I fails because the text message screenshots referenced in the SAC (which were attached to Plaintiff's FAC) demonstrate that each message contained a link to a "getitfree.us" website.  *See* SAC ¶ 10, n.1 (referring to FAC, Exhibit A).  The purpose of the TCPA's identification requirements is to "secure a person's ability to identify and respond to a caller." *Nece v. Quicken Loans, Inc*., No. 8:16-cv-2605, 2018 WL 1326885, at *9 n.9 (M.D. Fla. Mar. 15, 2018).  By including a link to its website in each text message Plaintiff received, Zeeto complied with 47 C.F.R. § 64.1200(d)(4). *See Bailey*, 867 F. Supp. 2d at 842 (dismissing 47 C.F.R. § 64.1200(d)(4) claim where Domino's Pizza included a link to its website in each text message received by plaintiff because, among other reasons, there was no "plausible factual and legal basis" for the claim).  Indeed, the TCPA identification requirements clearly were satisfied as Plaintiff acknowledges that, because each text message referenced Zeeto's website, he "learned" that it was associated with and owned by Zeeto.  SAC ¶ 6.  Count I fails for this reason as well.

### C.    Plaintiff Fails to Allege Facts Supporting His Claim That Zeeto Called His Phone With an Autodialer; Count II Should Be Dismissed

The TCPA provides that it shall be unlawful "to make any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone

---

[12]    Zeeto added Plaintiff's number to its internal do not call list upon being first contacted by him.

service" without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). An ATDS is "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id*., § 227(a)(1). The FCC has confirmed that the TCPA "does not regulate live calls that are manually dialed without an autodialer; [nor does] it . . . ban all automated calls . . ." *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir.), Brief for Respondents (Jan. 15, 2016), at 93; *see also*, *e.g.*, *Adamcik v. Credit Control Servs., Inc*., 832 F. Supp. 2d 744, 750 (W.D. Tex. 2011) ("Turning to the effect of [TCPA] § 227(b), it has no prohibition or effect at all on ordinary, 'live' phone calls – the statute's express terms limit its application to automatic dialer or prerecorded calls."). In other words, the TCPA's prior express consent requirements are not implicated and no consent is necessary where a company manually dials that consumer's cell phone.[13]

Plaintiff asserts that Zeeto used an ATDS because (1) the text messages came from a short code; (2) two messages sent the same day (but four hours apart) were identical; (3) the privacy policy on Zeeto's Get It Free website references that "some" text message campaigns "may be conducted via an automated telephone dialing system"; (4) the text messages were otherwise generic offers that appeared to be generated to a large number of individuals; and (5) Zeeto's internal records utilize the phrases "campaign fields" and "system fields," and pre-suit

---

[13]    Notably, Plaintiff goes to lengths in his SAC in an attempt to plead that his cell phone should really be considered to be his residential telephone number so as to avoid dismissal of his Section 227(c)(5) claim (Count I) because, as detailed above (*supra*, at 13-15) that Section of the TCPA applies only to "residential telephone subscribers." *See* SAC ¶ 9. Yet, if Plaintiff is correct and his cell phone is properly considered to be a residential telephone number, then Count II necessarily fails as a matter of law because autodialed telemarketing calls (or texts to the extent even technologically possible) to a residential number do not require the recipient's consent at all. *Orsatti v. Quicken Loans, Inc*., No. 2:15-cv-09380, 2016 WL 7650574, at *3 (C.D. Cal. Sept. 12, 2016) (confirming that consent is required only for prerecorded message calls to a residential phone number, not autodialed calls; "As a matter of law, the ATDS prohibition under § 227 applies to cellular phones . . . not residential phone lines. . . . Accordingly, the Plaintiff's claims [that the defendant used an autodialer to place telemarketing calls to her residential number without her consent] fails as a matter of law, as Plaintiff has not alleged . . . any ATDS call to a cellular device."). In other words, by asserting that "Plaintiff's Cell phone is a residential line," SAC ¶ 9, Plaintiff has pled himself out of a viable autodialer claim and Count II must be dismissed for that reason alone.

correspondence referred to Plaintiff's number being in our "system." *See* SAC ¶¶ 10–20.[14] These allegations, however, all miss the mark and do not support a plausible allegation that Zeeto used an ATDS.

First, the assertion that a defendant used a short code to send text messages does not support a plausible allegation in its own right that an ATDS was used.[15] *See, e.g., Jenkins v. mGage, LLC*, No. 1:14-cv-2791, 2016 WL 4263937, at *2, *5–7 (N.D. Ga. Aug. 12, 2016) (fact that plaintiff received approximately 150 generic text messages "from [defendant's] short code" did not support finding that an ATDS was used by defendant);[16] *see also Duguid v. Facebook, Inc.*, No. 15-cv-00985, 2017 WL 635117, at *4 (N.D. Cal. Feb. 16, 2017) (granting dismissal with prejudice where text messages were sent from short code). Much more is required.[17] For example, allegations that a defendant used an ATDS because text messages were "formatted in SMS short code licensed to defendants, scripted in an impersonal manner and sent en masse [to

---

[14]    Plaintiff also points to a 2012 press release regarding the number of consumers who subscribed to Zeeto's electronic newsletter in 2012 and asserts that Zeeto's alleged 55 employees "aren't manually typing and sending individual text messages" to these subscribers. SAC ¶ 20. Zeeto's electronic newsletter *emailing* campaigns from six years ago simply has no bearing on the salient issue – whether the texts plaintiff received in late 2017 were sent via ATDS.

[15]    Plaintiff cites to the website of a texting vendor called "CallFire" to support his allegation that use of a short code demonstrates that an ATDS was used. SAC ¶ 11 n.5.   Ironically, in *Luna v. Shac, LLC*, the court held that CallFire's texting platform, which was able to blast out tens of thousands of text messages at once from a short code, was not an autodialer as a matter of law due to the minimal amount of human involvement required to assemble the list of numbers to be texted, draft the text, and click the "send" button or schedule a future time for the messages to be sent.  122 F. Supp. 3d 936, 940-41 (N.D. Cal. 2015).

[16]    The text messages sent to the *Jenkins* plaintiff stated (1) "Don't miss the # do it for the Vine Party tonight @ Opera Wednesdays.  Show txt for Ladies Free till 11, 18+ $10.00 till 11, & 21+ $5 till 11!"; and (2) "Tonight @ over eleven months Opera Wednesdays Lust, Love and Latex Party! Arrive early and show txt for Ladies Free til 11, Guys 18+ $10 til 11 & 21+ $5".  *Id.*

[17]    Allegations regarding the sheer volume of calls or texts received likewise do not support a plausible claim of ATDS.  *Id.*; *Padilla v. Whetstone Partners, LLC*, No. 14-21079, 2014 WL 3418490, at *1-2 (S.D. Fla. July 14, 2014) (dismissing TCPA autodialer claim where plaintiff alleged that defendant used an ATDS to call his cell phone 41 times over four-month period without his consent).  In fact, just a few weeks ago, an Arizona woman was arrested and charged for reportedly sending a love interest 65,000 harassing text messages in the year following their date, including up to 500 texts in a single day from her smart phone.  *See Arizona v. Ades*, No. PF2018117644001 (Ariz. Super. Ct. May 9, 2018), Probable Cause Statement (*available at* http://ktvk.images.worldnow.com/library/ff45de26-d46c-4bdd-aa40-234ee284a6e0.pdf) (copy attached hereto as Exhibit "4" for the Court's convenience).  Clearly, those 65,000 texts were not sent using an ATDS.

thousands of putative class members]" sufficiently stated a claim in *Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-5142, 2010 WL 963225, at *2 (N.D. Cal. Mar. 16, 2010).[18]   Such SAC allegations are lacking here.

More specifically, there are no facts pled in the SAC to support Plaintiff's characterization that the text messages he received were blasted to a large number of individuals. SAC ¶ 17.  Indeed, Plaintiff has not identified even one other consumer that purportedly received one of the text messages that he did.  In fact, the purported text message screenshots show that ten of the 19 text messages were expressly directed to a woman named "Lynda," *see* FAC, Exh. A, at Oct. 22, 24, and Nov. 4, 7, 9, 14, 16, 20, 24, 28, 2017 Text Messages, and sent only in response to the online lead form that she purportedly completed.  *See id.*, at Exh. G (letter identifying that text messages were specifically sent to the individual who completed the lead form).  The personalized nature of the text messages directed towards a specific individual – *i.e.*, the individual who completed the lead form – militates against the use of an ATDS in the first instance.  *See Duguid*, 2017 WL 635117, at *4 (granting dismissal where text messages sent from short-code referring to plaintiff's Facebook account "suggested direct targeting that was inconsistent with the existence of an ATDS").

Further, there are no facts supporting Plaintiff's characterization that the texts he received were "generic."  SAC ¶¶ 7, 16.  To the contrary, the messages Plaintiff received were all different (except for a duplicative text sent four hours apart on one day), offering information on a host of products ranging from Harley-Davidson "freebies" to Starbucks gift sets to MAC makeup.  Yet, even if there were plausible allegations that the texts were generic, allegations that text messages were generic and impersonal are not sufficient to allege that they were sent by use

---

[18]    The text message at issue in *Kazemi* read: "PSST …Payless Insider, Ur the 1st to know BOGO starts TODAY 9/29!  bUY [sic] 1 Get One ½ off EVERYTHING 866-746-5923 or END3 to Opt-Out Text fees apply Not @ Shopko".  *Kazemi* Compl. (ECF 1), ¶ 17.

of an ATDS.  *See*, *e.g.*, *Friedman v. Massage Envy Franchising, LLC*, No. 3:12–cv–02962, 2013 WL 3026641, at *2 (S.D. Cal. June 13, 2013) (dismissing complaint of two plaintiffs who alleged that, over two month period, they received an unspecified number of similar text messages "containing impersonal information regarding offers and promotions," and explaining that "[t]he text messages that the Plaintiffs present are similar in content, but differ enough to make it appear as if an ATDS was not utilized").

Second, while Zeeto's Get It Free website privacy policy states that "***some***" text message campaigns "***may*** be conducted via an automated dialing system," SAC ¶ 13 (emphasis added), it has no bearing on whether the specific marketing text messages that Plaintiff himself received, in fact, were sent via an ATDS.  That Zeeto "may" send "some" text messages via autodialer generally does not make it any more plausible – nor does it support a "presumption" as Plaintiff alleges, *id.* – that it utilized an ATDS to send the specific text messages that underlie Plaintiff's SAC than it does that the text messages were manually dialed.  *See Priester v. eDegreeAdvisor, LLC*, No. 5:15-cv-04218, 2017 WL 4237008, at *3 (N.D. Cal. Sept. 25, 2017) (dismissing complaint because allegations "did not make it any more likely that Defendant used an ATDS; indeed, it is just as plausible to infer those calls were placed manually").  Indeed, while Plaintiff asks the rhetorical question why a company would seek consumer consent to dial cell phones at all if it does not use an ATDS in the first instance, SAC ¶ 14, the answer is quite simple: to ensure a "belt and suspenders" approach to TCPA compliance and a second-level TCPA defense (*i.e.*, that an ATDS was not used) in the event that a plaintiff claims that he did not provide consent to receive text messages.

Third, that Zeeto's do not call policy includes a template for the welcome message that Zeeto sends to those consumer who provide written consent, which is similar to the welcome

message Plaintiff received from Zeeto (SAC, ¶ 16 & FAC, Exh. G), does not support a plausible allegation that an ATDS was used to send that text message. It merely demonstrates that Zeeto has a corporate policy of sending a scripted welcome message to ensure uniformity; it does not suggest that the message is sent via autodialer any more than it suggests that the message is sent manually.

Finally, Plaintiff's allegation that, because Zeeto's internal record-keeping and pre-suit correspondence utilizes the phrases "system fields," "campaign fields," and Plaintiff's number being "in our system," Zeeto must have utilized an ATDS to send the text messages to him, SAC ¶¶ 17–18, borders on frivolous. The phrases "system fields" and "campaign fields" do nothing more than indicate that Zeeto tracks certain information internally, such as the date it received consent (*see* FAC., Exh. G (identifying "Capture Date and Time" under "System Fields" heading), and information about the consumer who provided consent, including his or her name, email, mailing address, phone number, and gender. *See id.* (data fields under "Campaign Field" heading). Similarly, colloquially explaining to Plaintiff that Zeeto "took the time to investigate your phone number and email address, and while your phone number is in our system, your email did not match the phone number listed within," *id.* (Dec. 14, 2017 letter from Zeeto to Plaintiff), merely supports the fact that Plaintiff's number appeared within Zeeto's records. "System" is not synonymous with or indicative of the use of an ATDS.

Plaintiff has failed to allege sufficient facts supporting his ATDS claim. Without such factual allegations, Count II should be dismissed under Rule 12(b)(6).

###     D.    Count II Should Be Dismissed Because Plaintiff Has Not Alleged That Zeeto's Reliance on the Consent It Had Was Unreasonable

Even if Plaintiff had sufficiently alleged that Zeeto utilized an autodialer, Count II still is subject to dismissal based on the D.C. Circuit's recent landmark decision issued in *ACA Int'l v.*

*FCC*, 885 F.3d 687 (D.C. Cir. Mar. 16, 2018), which held that a defendant is not liable under the TCPA for wrong or reassigned number calls or texts unless its reliance on the consent it had obtained was unreasonable.

In *ACA Int'l*, the petitioners sought review of the FCC's July 2015 Omnibus TCPA Order, which, among other things, concluded that a marketer who makes calls or sends texts inadvertently to the wrong number (because the number has been reassigned) does not have consent to do so. *In re Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7999–8000 (July 10, 2015) (the "2015 Order").[19]  The FCC concluded that if the telemarketer has actual or constructive knowledge that the number for which it has obtained consent is wrong or has been reassigned, it can be held liable under the TCPA for a violation.  *See id.*  However, the agency recognized that, in some cases the telemarketer may have no reason to know or think that the number is incorrect.[20]  In those cases, the telemarketer is permitted to make one call to the "wrong number" without exposure to TCPA liability; any subsequent calls to the wrong number are not exempt.  *See id.*

But, by providing a "one-call" safe harbor for reassigned numbers, the FCC explicitly chose not to impose a "'traditional strict liability standard on the caller: *i.e.*, a 'zero call' approach under which no allowance would have been given for the robocaller to learn of reassignment.'"  *ACA Int'l*, 885 F.3d at 705 (citation omitted); *see also id.* ("the Commission specifically declined to adopt 'a result that severe'").  Rather, for purposes of determining liability, calls to wrong or reassigned numbers should be evaluated under a "reasonable reliance"

[19]      There is no meaningful distinction between calls or texts to wrong telephone numbers and reassigned numbers under the TCPA.  Indeed, courts have treated them the same way under the 2015 Order.  *See, e.g.*, *Bush v. Mid Continent Credit Servs., Inc.*, No. CIV-15-112, 2015 WL 5081688, at *3 (W.D. Okla. July 28, 2015) (under the 2015 Order, "calls placed by companies to 'wrong numbers' or 'reassigned numbers' are actionable").

[20]      The 2015 Order "expressly contemplated that a new subscriber could 'purposefully and unreasonably' refrain from informing the good-faith caller about a number's reassignment 'in order to accrue statutory penalties.'"  *ACA Int'l.*, 885 F.3d at 705 (quoting 2015 Order).

standard – whether it is reasonable for the caller to rely upon the consent and number provided by the consumer who gave them in placing the calls or texts at issue.  *Id*., at 705–07 ("The Commission allowed for that one liability-free call, rather than impose 'a traditional strict liability standard,' because it interpreted a caller's ability under the statute to rely on a recipient's 'prior express consent' to 'mean reasonable reliance.'  And when a caller has no knowledge of a reassignment, the Commission understandably viewed the caller's continued reliance on the prior subscriber's consent to be 'reasonable.'") (internal citations omitted).

The court criticized the agency's adoption of a "one-call" safe harbor for post-reassignment or wrong number: "The first call or text message, after all, might give the caller no indication whatsoever of a possible reassignment (if, for instance, there is no response to a text message, as would often by the case with or without reassignment)."  *Id*., at 707.  "[A] caller's reasonable reliance on the previous subscriber's consent would be just as reasonable for a second call."  *Id*.  That same logic extends to ten text messages, 100 messages, or the 19 messages alleged in this case.  Thus, in order for liability to exist under the TCPA for texts placed to wrong or reassigned numbers, the sender's reliance on the consent and telephone number it obtained must be unreasonable.  The SAC does not make such allegation.

Here, Plaintiff alleges that he received 19 text messages addressed to a woman named "Lynda" who provided appropriate TCPA consent but used Plaintiff's cell phone number.  SAC ¶ 7 & FAC, Exh. G.  Zeeto's texts were directed to Lynda (ten messages specifically used Lynda's name).  *Id*.  Plaintiff has taken the position in this litigation that he "is not required to register his phone number on any do-not-call list or respond 'stop' to a text message that Plaintiff didn't sign up for."  Pl.'s Opp'n to Mot. to Dismiss (ECF 12), ¶ 25.  While that may be true as a general proposition, under *ACA Int'l*, in order for TCPA liability to actually attach for Zeeto's

texts, its belief that it had consent to text the number that Lynda entered into the lead form (*i.e.*, reliance) must have been unreasonable.   Such reliance might have been unreasonable had Plaintiff simply replied "STOP to opt out" of receiving future text messages as Zeeto's initial text instructed.   *See* FAC, at Exh. A (screenshot of initial text sent to Plaintiff).   But, Plaintiff did not.   In fact, Plaintiff typifies the text recipient who "'purposefully and unreasonably' refrain[s] from informing a good-faith caller [such as Zeeto] about" an incorrect number "'in order to accrue statutory penalties.'"   *ACA Int'l*, 885 F.3d at 705 (citations omitted).

Without any allegation that Zeeto's reliance on Lynda's consent to call a number that wound up being Plaintiff's was unreasonable – and there is none in the SAC and the pre-suit correspondence Plaintiff referenced therein, in fact, supports the exact opposite conclusion – there can be no liability for any of the texts sent to him.

### E.       Plaintiff Cannot State a Claim for Invasion of Privacy (Count III)

The SAC adds a one-sentence invasion of privacy count based on, presumably, an intrusion upon seclusion: "The foregoing actions by [Zeeto] constitute multiple breaches of the the [*sic*] Plaintiff's right to be left alone and an invasion of privacy."   SAC ¶ 36.   The elements of such a claim are: "'(1) an intentional intrusion upon a person's solitude, seclusion, or private affairs or concerns (2) that would be highly offensive to a reasonable person and, (3) as a result of which the person is injured.'"   *Wise v. Wilmouth*, No. 3:16-CV-1039-M-BH, 2017 WL 3267924, at *16 (N.D. Tex. July 3, 2017) (citation omitted).   Because Plaintiff cannot establish any of these three elements, Count III must be dismissed.

First, "[t]here cannot be an 'intrusion' where there is no legitimate expectation of privacy[.]"   *Id.*   As the Fifth Circuit and numerous district courts therein have held, "[u]sually an action for intrusion upon one's seclusion is found only when there has been a physical invasion

of a person's property or . . . eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying." *Id.* (citing cases); *see also Aldridge v. Sec'y, Dep't of the Air Force*, No. CIV.7:05CV00056-R, 2005 WL 2738327, at *3 (N.D. Tex. Oct. 24, 2005) ("Past acts that have qualified as an intrusion include spying, opening private mail, wiretapping, entering a person's residence, . . .  videotaping a bedroom without permission, . . . entering a home without permission, . . . searching a personal locker or purse, . . . and spying and harassment."). That makes sense – if the simple receipt of allegedly unwelcome texts or calls could constitute an invasion of privacy, then calls to Plaintiff from opposing counsel or even a court clerk would expose those individuals to liability. Plaintiff cannot credibly contend that his receipt of text messages is analogous to any of the above-identified intrusions. Perhaps most importantly, the common thread through each of those acts is the observation or recovery of private information about the plaintiff, an element absent here. Zeeto received no benefit or information regarding Plaintiff, not even a response indicating that the messages were unwanted.

As to the second element, "(1) the intrusion must be substantial enough that an ordinary person would feel severely offended, humiliated, or outraged, and (2) the intrusion must be unreasonable, unjustified, or unwarranted." *Smith v. Methodist Hosps. of Dallas*, No. 3:07-CV-1230-P, 2008 WL 5336342, at *6 (N.D. Tex. Dec. 19, 2008) (citations omitted). As noted above, Zeeto's messages were not unreasonable, especially given Plaintiff's choice not to respond to any of them with a request to unsubscribe. *See supra* at 8 & n.6. Even the Restatement (2nd) of Torts, from which the Texas cause of action was derived, *see Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973)*, explicitly acknowledges that "there is no liability for . . . calling [plaintiff] to the telephone on one occasion or even two or three . . ." *Dickson v. Am. Red Cross Nat. Headquarters*, No. CIV.A. 3:95-CV-2391P, 1997 WL 118415, at *11–12

(N.D. Tex. Mar. 10, 1997) (quoting Restatement (Second) of Torts § 652B cmts. c & d (1977)); *see also Cherkaoui v. Santander Consumer USA, Inc.*, 32 F. Supp. 3d 811, 816 (S.D. Tex. 2014) (granting summary judgment to defendant even though it allegedly had placed 700 autodialed calls to plaintiff's cell phone, including up to 12 calls a day).[21] Further, while Plaintiff may have alleged "Annoyance, Frustration, [and] Anger" among his injuries, intrusion upon seclusion is not a strict liability tort and is concerned only with the response "that an ordinary person would feel." *Smith*, 2008 WL 5336342, at *6.

Finally, unlike with his claims under the TCPA, Plaintiff cannot rely upon a statutorily created injury and must instead plead an injury-in-fact that rises beyond a *de minimis* level. This is the crux of this case, and this he cannot do. Plaintiff's invasion of privacy claim, thus, fails.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the FAC.

Dated: May 24, 2018                           Respectfully submitted,

/s/ *Daniel S. Blynn*
Daniel S. Blynn (*pro hac vice*)
E-mail: dsblynn@venable.com
S. Tyler Hale (*pro hac vice*)
E-mail: sthale@venable.com
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-4000 (Telephone)
(202) 344-8300 (Facsimile)

J. Thad Heartfield
Texas State Bar No. 09346800
E-mail: thad@heartfieldlawfirm.com
M. Dru Montgomery
Texas State Bar No. 24010800
E-mail: dru@heartfieldlawfirm.com

---

[21]    The *Cherkaoui* complaint identifies the volume of calls allegedly placed to that plaintiff. *See* No. 4:13-cv-467, Compl. (ECF 1-3) ¶ 7.

THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, TX 77706
(409) 866-3318 (Telephone)
(409) 866-5789 (Facsimile)

*Attorneys for Defendant ZeetoGroup, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May, 2018, I have electronically filed a copy of the foregoing Motion to Dismiss Plaintiff's Second Amended Complaint with the Clerk of the Court using the CM/ECF system, which automatically sends an electronic notification to all counsel of record and other CM/ECF participants. A copy also has been served via first-class mail on:

Craig Cunningham
5543 Edmondson Pike, Suite 248
Nashville, TN 37211


/s/ *Daniel S. Blynn*